# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| APS EXPRESS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-03275 |
| | ) | |
| SEARS HOLDINGS CORPORATION, | ) | Judge Sharon Johnson Coleman |
| SEARS HOLDINGS MANAGEMENT | ) | |
| CORPORATION, and INNOVEL | ) | |
| SOLUTIONS, INC., *formerly known as* | ) | |
| SEARS LOGISTICS SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff APS Express, Inc. ("APS") filed a nine count complaint against Sears Holdings Corporation ("Sears Holdings") and its subsidiaries, Sears Holdings Management Corporation ("Sears Management") and Innovel Solutions, Inc., formerly known as Sears Logistics Services, Inc. ("Sears Logistics"), collectively "Sears." APS's claims arise out of Sears' alleged failure to prevent its truck drivers from stealing and reselling appliances to which APS maintains it had a contractual right. Sears moves to dismiss all the claims brought against it under Rule 12(b)(6). For the reasons stated below, the Court grants the motion in part and denies in part.

**Background**

The following facts taken from the Complaint are accepted as true for purposes of ruling on the motion to dismiss now before the Court. Sears is the owner of online and brick-and-mortar retail stores that sell, among other goods, home appliances. Dkt. 5, ¶¶ 12-13. When a customer purchases an appliance from Sears, Sears offers to remove the customer's old appliance and dispose of it in compliance with environmental safety regulations. *Id.*, ¶¶ 14-15. While Sears itself effectuates the removal of old appliances from customers' homes ("haul-away services"), it retained to APS to

recycle or dispose of the appliances ("recycling services"). *Id.*, ¶¶ 11, 21-28; Dkt. 28-2 at 5; 28-4 at 6. In order to provide recycling services, APS placed trailers at Sears' distribution centers for receipt of the appliances collected from haul-away services. Dkt. 5, ¶ 22. APS periodically transported the trailers to APS's facilities and then recycled some of the appliances and sold others to wholesale appliance dealers. *Id.*, ¶¶ 23-26. Based on the fact that the profit APS made off of the resalable appliances exceeded the cost of recycling the other appliances, APS paid Sears for each appliance received from haul-away services. *Id.*, ¶ 1.

APS had been providing Sears with recycling services since 1994. *Id.*, ¶ 28. In 2011, Sears decided to award contracts for providing recycling services via an online auction. *Id.,* ¶ 29. In advance of the online auction, Sears' representatives provided APS with a Master Service Agreement ("MSA") and a Statement of Work ("SOW") which together would constitute a contract for recycling services awarded to APS upon a successful bid. *Id.*, ¶ 31-34. APS interpreted this contract as a guarantee that APS would receive all appliances generated by haul-away services if it provided Sears with recycling services ("2011 Exclusivity Misrepresentation"). *Id.*, ¶31. Sears representatives also provided APS with a spreadsheet that listed each distribution center and the historical volume of each type of appliance generated by haul-away services at that distribution center. *Id.*. APS alleges the volume of appliance data was inaccurate and "substantially overstated" the amount of appliances generated by haul-away services ("2011 Volume Misrepresentation"). *Id.* APS participated in the auction and was awarded a contract to provide recycling services at 16 distribution centers around the country ("2011 contract"). *Id.*, ¶ 35.

APS participated in another online auction for a recycling services contract in 2014. *Id.*, ¶¶ 39-47. Bids were for the provision of statewide recycling services, rather than for servicing individual distribution centers. *Id.*, ¶40. Sears representatives again provided APS with a sample MSA and SOW that would form an awarded recycling services contract ("2014 contract") and with data

2

regarding the volume of appliances historically generated at each distribution center. *Id.*, ¶ 42. Sears representatives also provided a list of each distribution center located in each state. *Id.* As with the 2011 contract, APS interpreted the 2014 contract as a guarantee that APS would receive all appliances generated by haul-away services ("2014 Exclusivity Misrepresentation"). *Id.* APS alleges the 2014 data, like the 2011 data, was inaccurate: the volume of appliances generated by haul-away services was overstated ("2014 Volume Misrepresentation"), as was the number of distribution centers in each state ("2014 Scope Misrepresentation"). *Id.*

During performance of the 2014 contract, APS noticed there were less resalable appliances generated by haul-away services than expected, and investigated as to why this was the case. ¶¶48-49. During this investigation, APS discovered that since at least 2011, some delivery truck drivers sold some of the appliances removed from customers' homes themselves for their own profit rather than placing them in APS's trailers. *Id.*, ¶ 50-55. A manager and assistant manager at a distribution center serviced by APS admitted to APS that Sears was aware of this practice. *Id.*, ¶53. APS also spoke with a former loss prevention manager for Sears who told APS that Sears instructed the loss prevention department in 2011 to "stop policing" how delivery truck drivers handled haul-away appliances. *Id.*, ¶ 54. When APS confronted Sears about this practice, Sears terminated the 2014 contract. *Id.*, ¶¶ 59-64. Sears' alleged willful disregard of its truck drivers' theft and its termination of the 2014 contract forms the basis of APS's claims for breach of contract, tortious interference with a contract, fraud, negligent misrepresentation, and quantum meruit.

**Legal Standard**

A complaint will survive a motion to dismiss under Rule 12(b)(6) if its allegations when accepted as true and viewed in the light most favorable to the plaintiff state a plausible claim. *Peters v. West*, 692 F.3d 629, 632 (7th Cir. 2012). Facts alleged in a complaint are accepted as true except when contradicted by an exhibit considered part of the pleadings. *Bogie v. Rosenberg,* 705 F.3d 603, 609 (7th

3

Cir. 2013). Exhibits attached to a motion to dismiss are considered part of the pleadings if they are referred to in the complaint and are central to the claims. *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

**Discussion**

*1. Breach of Contract and Tortious Interference with a Contract*

Sears Logistics argues that the breach of contract claims brought against it must be dismissed for three reasons. First, contrary to APS's contentions, the contract does not guarantee that Sears Logistics will give all haul-away appliances to APS. Second, APS failed to allege it substantially performed on the contracts at issue. Third, because the contracts granted Sears an unfettered right to terminate, termination of the 2014 contract was not a breach.

The Court must examine APS's contract claims under Illinois law. The parties agreed in the 2011 and 2014 contracts that Illinois law would govern interpretation of the contracts and "all other aspects of the business relationship between the parties." Dkt. 28-1 at 14, 28-3 at 16. The validity of a choice-of-law contract clause is determined by the rules of the forum state, here Illinois, and Illinois law generally respects such clauses absent a claim that the contract is invalid or contrary to public policy. *Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1011 (7th Cir. 2000).

Under Illinois law, the Court's first task when interpreting a contract is to determine if the language of the contract is ambiguous, which is determined as a matter of law. *Lewitton v. ITA Software, Inc.,* 585 F.3d 377, 379 (7th Cir. 2009). If the contract is ambiguous, it is appropriate to look at extrinsic evidence to determine the parties' intent, but if the language is unambiguous, the contract should be enforced as it is written. *Id.* at 380. Contract language is not ambiguous simply because the parties disagree as to its meaning, but only if it is "reasonably susceptible to different constructions." *Kaplan v. Shure Bros.*, 266 F.3d 598, 605 (7th Cir. 2001). Additionally, contested

4

language in a contract should not be looked at in isolation; rather the contract should be examined as a whole. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1038 (7th Cir. 1998).

Although APS did not attach the contracts to its complaint and instead quoted the provisions it considered relevant, the Court will consider the contracts in their entirety, as they were attached to the motion to dismiss, are referred to in the complaint, and are central to APS's claims. *Wright,* 29 F.3d at 1248. Under the contracts, Sears Logistics retained APS "for handling, recycling and disposing of Materials" in accordance with a five step process outlined in the SOW. Dkt. 28-2 at 5; 28-4 at 6. "Materials" includes, among other things, "all materials that are generated in connection with [Sears Holdings] Home Delivery operations." Dkt. 28-2 at 9; 28-4 at 10. The parties have put forth two different interpretations of the word "all" in the description of "Materials," demonstrating that the language is indeed susceptible to different constructions. The question for the Court thus becomes whether both constructions are reasonable.

Sears Logistics asserts the description of "Materials" includes the word "all" in order to exhaustively describe the types of items APS may not decline to handle, recycle, or dispose of. Put differently, "all" is included in the description of Materials for Sears Logistics' own protection, so that APS does not refuse items whose disposal is particularly onerous or cumbersome. When viewed in light of the contract as a whole, which is a contract by which Sears Logistics retained APS to provide it recycling services, Sears Logistics' construction of the term "all" is reasonable. It is further bolstered by the provision at the end of the description of "Materials" which states that APS "will not have the ability to 'cherry pick' items" and notes that some items may still contain hazardous substances. Dkt. 28-2 at 10; 28-4 at 11.

In contrast, APS asserts the word "all" grants APS a contractual right to everything that Sears removes from a customer's home when performing haul-away services. The problem fatal to APS's interpretation is not the description of "Materials", but the operative provision in which the term

5

appears: "[Sears Logistics] retains [APS] for handling, recycling and disposing of Materials [which includes 'all materials that are generated in connection with Sears Holdings Home Delivery operations']." This provision does not grant APS a right, but rather creates an obligation: to handle, recycle, and dispose of the items loaded onto its trailers so long as those items meet the description of "Materials" in the contract. That APS has no particular right to any items until they are loaded on its trailers and driven off of Sears' property is further supported by the contract provision which states that "[t]itle and ownership of the Materials passes to [APS] when Materials are removed from Locations." Dkt. 28-2 at 5; 28-4 at 7. The contracts define "Locations" as various stores and distribution centers owned and operated by Sears. Dkt. 28-2 at 11, 28-4 at 12. Customers' homes are not included in the definition of Locations. *Id.* Accordingly, the Court agrees with Sears Logistics that the theft of appliances by Sears' truck drivers does not constitute a breach of contract.

The termination of the 2014 contract likewise cannot support a claim for breach because the contract allows for termination without cause. Dkt. 28-3 at 3. Without any cognizable theory of breach, APS cannot state a claim for tortious interference. APS's breach of contract and tortious interference with a contract claims are therefore dismissed with prejudice.

*2. Fraud*

Sears Holdings moves to dismiss the fraud claims brought against it on the grounds that (1) APS has failed to establish that any alleged misrepresentations proximately caused it any injury and (2) APS has failed to plead with sufficient particularity the circumstances of the fraud.

APS bases its claims for fraud on the 2011 and 2014 Exclusivity Misrepresentations, the 2011 and 2014 Volume Misrepresentations, and the 2014 Scope Misrepresentation. A fraudulent misrepresentation claim based on the Exclusivity Misrepresentations fails for the same reason as the breach of contract claims: the SOW cannot reasonably be understood as a representation by Sears

6

that no materials removed from customers' homes will be lost, damaged, or stolen before they are loaded onto APS trailers.

With respect to the Volume Misrepresentations and the Scope Misrepresentation, Sears Holdings argues that even if APS relied on false data in constructing its bids for the contracts, APS cannot show that it would have been awarded the contracts if it had placed a different bid with pricing based on accurate data. Dkt. 28 at 11. While this may be true, it does not defeat APS's fraud claim. While APS might not have been awarded the contract had it placed a lower bid, it also would not have expended the costs it did in preparing for and performing on the contract. Furthermore, it would have been free to pursue other more lucrative business opportunities. These injuries can reasonably be inferred from APS's allegations that it relied to its detriment on the misrepresentations by entering into the contracts and incurring operational expenses. *See* Dkt. 5, ¶¶ 111, 133.

APS pleaded its fraud claims based on the Volume Misrepresentations and the Scope Misrepresentation with sufficient particularity. APS identifies the Sears Holdings employees that provided the false information by name. Dkt. 5, ¶ 107, 129. It also identifies the substance of the misrepresentation (inaccurate data about the historical volume of haul-away appliances and number of distribution centers), the manner in which it was delivered to APS (in spreadsheets and in writing), and the time period in which it occurred (immediately preceding the auctions in July and August 2011 and June and July 2014). *Id.* This is sufficient to meet the requirements of Rule 9(b).

*3. Negligent Misrepresentation*

Sears Holdings argues that APS's negligent misrepresentation claims are barred by the *Moorman* doctrine, which provides that a plaintiff seeking to recover solely economic losses under a theory of negligent misrepresentation must show that the defendant "is in the business of supplying information for the guidance of others in their business transactions." *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 452 (Ill. 1982). APS asserts Sears Holdings falls under the exception because

7

part of its business was providing information during the bidding process that guided APS in its business dealings. Dkt. 29 at 8-9.

When determining if a defendant is "in the business of supplying information," courts must focus on the "ultimate result" of the defendant's work. *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1201 (Ill. 1997). If "the information that is supplied is merely ancillary to the sale or in connection with the sale of merchandise," the exception does not apply. *Id.* Here, Sears Holdings' ultimate goal is to sell retail goods. Dkt. 5, ¶12. Any information supplied to APS in connection with the bidding process was for the ancillary purpose of securing a contractor to provide recycling services in furtherance of Sears' retail operations. The exception therefore does not apply, and APS's negligent misrepresentation claims are dismissed.

*4. Quantum Meruit*

To state a claim for quantum meruit, APS must allege (1) it performed a service that benefitted defendants; (2) it performed the service non-gratuitously; (3) defendants accepted the service; and (4) no contract existed to prescribe payment for the service. *Owen Wagener & Co. v. U.S. Bank*, 697 N.E.2d 902, 908 (Ill. App. 1998). A plaintiff may plead a claim for quantum meruit as an alternative to its breach of contract claim in order to recover the value of its work even if it is ultimately determined that compensation for the work was not covered by the contract at issue. *Patrick Eng'g, Inc. v. City of Naperville*, 955 N.E.2d 1273, 1289 (Ill. App. 2011), *rev'd on other grounds*, 976 N.E.2d 318 (Ill. 2012).

Here, APS's claim for quantum meruit fails because APS did not allege that the contracts at issue failed to prescribe payment for the recycling services provided. Instead, APS merely states that Sears has not "fully compensated APS for the services it has provided." Dkt. 5, ¶150. Nonetheless, a review of the contracts themselves reveals there was indeed no explicit provision for payment to

8

APS. Accordingly, this claim is dismissed without prejudice and with leave to refile a properly pleaded quantum meruit claim.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is granted as to Counts I, II, III, IV, VI, VIII, and IX and denied with respect to Counts V and VII. Counts I, II, III, IV, VI, and VIII are dismissed with prejudice and Count IX is dismissed without prejudice and with leave to re-plead.

IT IS SO ORDERED.

_____
SHARON JOHNSON COLEMAN
United States District Judge

DATED:  October 20, 2015