# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| APS EXPRESS, INC., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 15-cv-3275 |
| | ) Judge Sharon Johnson Coleman |
| SEARS HOLDING CORPORATION, SEARS HOLDING MANAGEMENT CORPORATION, and INNOVEL SOLUTIONS, INC. *formerly known as* SEARS LOGISTICAL SERVICES, INC., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, APS Express, Inc. ("APS") filed its Third Amended Complaint against Sears Holding Corporation, Sears Holding Management Corporation, and Innovel Solutions (collectively, "Sears"), to recover the value of the used appliance processing services APS rendered to Sears from 2011 through April 14, 2015, and to recover for damages suffered when it detrimentally relied upon Sears' allegedly false representations in bidding for a new haul-away contract. Sears now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 for all claims in Sears' Third Amended Complaint and for its counter claim against APS. Sears filed a cross-motion for partial summary judgment on two of its claims, Counts I and IV. After reviewing the parties' submissions and the evidence before it, Sears' Motion is granted in part and denied in part. APS' Motion is denied.

### Background

The following facts are undisputed unless noted. Defendants, Sears Holding Corporation, Sears Holding Management Corporation, and Innovel Solutions (collectively, "Sears") are Delaware

1

corporations whose primary place of business is in Illinois. Plaintiff, APS Express, Inc. ("APS") is a Florida corporation that operates out of Florida. It formerly performed haul-away services for Sears from 2001 through April 15, 2015, when Sears terminated the contract. Sears was APS' only haul-away customer during that time period.

APS and Sears' business arrangement worked as follows. Sears offered customers that purchased large items, like appliances, the option of paying a fee to have their old items removed and recycled. Sears used third-party carriers to deliver the new items and haul-away the old or broken ones to the APS trailers at the Sears' distribution centers. After picking up a used appliance from a customer's home, the third-party drivers were supposed to bring the item back to a Sears Distribution Center to be placed in the on-site APS trailer for processing. There were instances where the third-party drivers stole the hauled away items, or replaced them with appliances from junkyards before putting them in the APS trailers. Parties dispute whether the third-party carriers or Sears were responsible for preventing the drivers from taking or swapping out "haul away" items. Once a trailer was full of used appliances and other haul-away materials, APS transported the trailer to its facilities where the items were classified as resalable, recyclable, or trash. Since there was a secondary market for the used appliances, APS agreed to pay a per-appliance fee for certain types of used appliances it hauled away, in exchange for the right to resell those appliances or recycle the components for sale as scraps.

*March 18 Meeting*

On March 18, 2011, APS Executives, Basil Beck and Wendy Beck, attended a meeting at Sears Headquarters in Hoffman Estates, IL with the Sears Management. The Sears team included Gary Fenske, Troy Kohler, David Torma, and David Acquaviva, and the loss prevention manager, Paul Jankowski, via phone, to discuss their potential business agreement. Fenske was APS' main

point of contact with Sears. Basil Beck testified that members of the Sears team made the following representations to APS during that meeting: 1) Sears had better anti-theft measures than tamper-proof stickers; 2) Sears already implemented anti-theft processes with the haul-away that are like the new product; 3) Sears had a zero tolerance for driver theft; 4) Sears did not have a theft problem and if it did, the loss prevention person would "nip it in the bud"; 5) drivers were terminated if they stole; 6) Sears knew and believed that any problem with driver theft or "switching out" was under control; 7) Sears' loss prevention department was capable of addressing haul-away theft issues; 8) no other vendors would service APS' areas; and 9) Sears wanted APS to bid full, premium pricing because Sears was committed, and would continue to be committed to not tolerating theft. Basil Beck Dep. 144-404, Nov. 17, 2016. Wendy Beck's testimony was substantially similar. Wendy Beck Depo. 88-112, Nov. 22, 2016. Sears offered Fenske's deposition to dispute that these statements were made during the meeting and refute that the statements were properly characterized by Basil and Wendy Beck.

In addition to the meeting on March 18, 2011, Fenske sent several internal email correspondences suggesting that he and Sears were aware that appliance theft occurred and affected the volume of haul-away material. In 2010, he sent an email detaining the opportunity for Sears to accrue over $1.3 million if it could recover all of the haul-away appliances that are sold, traded out, or taken by drivers. Fenske also sent several internal emails in 2013 and 2014 suggesting that the discrepancies between the number of delivered appliances and the haul-away volumes in Sears' internal reports were caused by driver theft of the hauled-away appliances. Sears disputes that theft is the reason for the missing items and attributes that rationale to rumors from other vendors and Fenske's opinions, as the company as a whole was not aware of any theft problem. Finally, Fenske also sent an email where he expressed that the haul away vendors expected Sears to remedy the

3

problem of drivers swapping out the used appliances prior to delivering the items to the vendor because they were paying premium prices for reasonably used items but receiving junk instead. Sears argues that these emails were mischaracterized and irrelevant because Fenske's emails were directed at other vendors in different territories.

*Bidding Auctions*

Sears notified APS and other prospective bidders that Sears would conduct its first online auction in August 2011 to award haul-away business to various vendors over the next three years. Prior to the auction, on June 22, 2011, Sears' Facility Services Procurement Manager emailed APS and other prospective vendors to acquire their haul-away volume information from the month of April 2011, and compile the data into one sheet.

On August 4, 2011, Sears' Facility Services Procurement Manager sent APS an email describing how the online auction would be used to award the haul-away service contracts from September 2, 2011 until August 31, 2014. Sears also sent all prospective vendors, including APS, a spreadsheet ("2011 Bid Proposal") labeled "Monthly Total Number of Units," which contained volume numbers for various haul-away items by location. The 2011 Bid Proposal did not specify that the volume numbers were taken from the month of April 2011 only. APS saw the 2011 Bid Proposal in advance of the auction. APS now challenges the 2011 Bid Proposal contending that such a document should have represented the volume average across time, not a single month. Additionally, while APS acknowledges the veracity of the numbers it submitted for April 2011, but it disputes the accuracy of the numbers submitted by other vendors. The auction took place on August 22, 2011. APS was the incumbent provider in 16 locations, which permitted it access to those historical volume numbers. APS, however, did not examine those previous volumes, but instead relied on the "Monthly Total Number of Units" provided in the bid sheet when setting its

prices. Based on APS' competitive bidding, it was selected as the haul-away vendor for 27 Sears locations.

On August 30, 2011, Sears and APS signed a Materials Processing Master Services Agreement ("MSA") and accompanying Statement of Work ("SOW"). The MSA contained the terms for the service relationship between Sears and APS. (Dkt. 143-21). It made "no representations as to the amount of business [APS could] expect under this Agreement." (*Id.*). It determined that "compensation for all Services [would] be set forth in the applicable SOW and [would] remain in effect for the term thereof and [would] not be changed except by an amendment to the SOW signed by both parties." (*Id.* at 5.1). Under the MSA, Sears would "not be liable to [APS] for any capital expenditures or expenses incurred for additional personnel, supplies, facilities, or equipment in reliance upon or in anticipation of providing services to" Sears and APS "release[d] and discharge[d Sears] . . . from any and all claims in law or equity for expenses or damages incurred during the term of this Agreement or after its termination arising out of [APS'] investment in such equipment, materials, personnel and facilities." (*Id.* at 5.3-5.44). Both parties also signed the 2011 SOW, which was incorporated as part of the 2011 MSA and included additional terms for the haul-away and appliance processing services. (Dkt. 143-21). The services statement in the SOW indicated that Sears retained APS "for handling, recycling and disposing of Materials . . . [and a]ll Services shall be at [APS'] own expense." (*Id.*). Under the 2011 SOW, APS agreed to pay Sears for the services outlined under the agreement and was responsible for "all costs of administering, operating and performing the Services." (*Id.*).

When the initial haul-away contracts reached their expiration, Sears conducted a second haul-away auction on July 2, 2014. It differed from the 2011 auction because vendors were expected to bid by state and not by the geographic groupings of the Sears' facilities. Sears also included nine outlet stores in the auction as potential haul-away assignments. These locations, however, were

operated by a separate entity, which had sole discretion over awarding contracts for its outlet stores. Parties dispute whether Sears clearly articulated that it could not guarantee the contracts for the outlets. Similar to the first auction, Sears distributed a bid and pricing proposal sheet ("2014 Bid Proposal") to the vendors on June 30, 2014 that contained the exact same haul-away volume information used in the 2011 Bid Proposal. APS saw the 2014 Bid Proposal at least one time prior to the auction; however, it did not ask about the source of the volume figures or do any independent investigating into the numbers.

After the 2014 auction, APS was selected as the haul-away vendor in six states and was the incumbent supplier in many of the Sears facilities it was awarded. Some of the territories APS won housed outlets. The 2014 MSA and SOW contained substantially similar terms and provisions as the 2011 versions. APS signed the MSA on May 14, 2014 and the SOW on June 11, 2014, but Sears never did. (Dkt. 9 and 27). On September 1, 2014, APS continued to haul-away materials from the facilities consistent with the terms of the 2014 MSA and SOW. Sears sent APS "final" versions of the MSA and SOW to sign around November 2014, but the documents were not executed by either party prior to this suit.

*APS' Haul-Away Numbers*

Over the course of its relationship with Sears, APS prepared and maintained "month-end reports," containing the numbers and type of appliances it hauled-away. This permitted APS to calculate payments to Sears. Between September 2011 and April 2015, APS hauled away 1,041,045 used appliances from Sears locations, generating $31,008,109 in revenue from the resale and recycling of those appliances. APS paid Sears a total of $15,019,466 to acquire those appliances during that time, except for in between December 2014 and April 2015 when Sears asserts that APS did not remit any payments. While APS agrees that the aforementioned numbers are technically correct, it disputes that they are complete and accurate figures because they fail to include the

6

millions of dollars in expenses, labor, equipment, materials, fuel, rent, and other costs associated with providing recycling services. APS claims that it lost $8,647,148 by providing gratuitous recycling services to Sears between September 2011 and April 2015, and such services afforded Sears a benefit of $11,228,824.

Sears now claims that APS stopped paying for the haul-away merchandise from December 2014 and April 2015, and so, it now owes Sears a total of $1,667,8668.14. In an effort to mitigate damages, Sears drew $200,000 from APS' line of credit and applied the cash deposit credit of $925,000 that APS provided to Sears under the 2014 agreement. This reduced the total amount Sears alleged APS owed Sears for the hauled-away used appliances to $542,868.14. APS contends that this retained amount of $1,125,000 is Sears' compensation for the period of alleged nonpayment.

In April 2015, Sears terminated its relationship with APS because APS failed to pay for the hauled-away appliances from December 2014 through April 2015. APS disputes this reason, alleging that Sears terminated the agreement because APS wanted Sears to fix the appliance theft problem so that it could receive the full benefit of the haul-away services.

## Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also* Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, and if done, judgment as a matter of law should be granted in its favor. *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 988 (7th Cir. 2006). "To determine whether genuine issues of material fact exist, we ask if 'the evidence presents a sufficient disagreement to require submission to

7

a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013) (citing *Anderson*, 477 U.S. at 251-52). All evidence and inferences must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**Discussion**

*Count I – Quantum Meruit (unjust enrichment)*

Both parties move for summary judgment as to the first count of *quantum meruit*. APS alleges that it performed non-negotiated, valuable services for Sears from 2011 through April 14, 2015 when it hauled away and processed junk appliances that Sears' delivery drivers acquired at used appliance dealers or junk yards. APS contends that it never received compensation for this collateral service of recycling junk, and that it is entitled to summary judgment as to the unjust enrichment claim because Sears accepted this benefit to APS' detriment. Sears, on the other hand, contends that it is entitled to summary judgment on this claim because the service contract provided that APS would provide haul-away and recycling services at its own expense to Sears.

Unjust enrichment occurs when a party retains benefits to the other party's detriment, and retention of that benefit violates the principles of justice, equity, and good conscience. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). A successful claim based on the theory of *quantum meruit* exists (1) where one party performs a service for another's benefit; (2) the benefiting party accepts the benefit; and (3) the circumstances surrounding the agreement indicate that the service was not intended to be gratuitous. *ImagePoint, Inc. v. BFS Retail & Commer. Operations, LLC*, No. 13 C 4339, 2014 U.S. Dist. LEXIS 175622, at *10 n.19 (N.D. Ill. Dec. 19, 2014)(Cox, J.)(citing *Midwest Emergency Assoc.-Elgin Ltd. v. Harmony Health Plan of Ill., Inc.*, 382 Ill. App. 3d 973, 888 N.E.2d 694, 701, 321 Ill. Dec. 175 (Ill. App. 1st Dist 2008)). "Illinois law [however,] does not permit a party to recover on a theory of quasi-contract when an actual contract governs the parties' relations on

8

that issue." *Keck Garrett & Assocs., Inc. v. Nextel*, 517 F.3d 476, 487 (7th Cir. 2008)(citing *Illinois ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 607 N.E.2d 165, 177 (Ill. 1992)).

APS contends that it provided Sears with valuable recycling and disposal services in conjunction with the contracted for haul-away services, and so, it is entitled to recover money for Sears' collateral benefit now. As the law stands, the theory of *quantum meruit* cannot apply here since a clear agreement between the parties that outlines the expectations for the disposal and recycling of the haul-away materials exists. *See Keck*, 517 F.3d at 487. It appears, however, that APS is trying to obtain compensation that it could not recover under the terms of its agreement with Sears. There is no dispute about whether APS and Sears signed the 2011 MSA and SOW, which governed their business relationship for the following three years. Additionally, although Sears did not sign the 2014 MSA and SOW along with APS, both parties acted in substantial compliance with those terms, continuing to engage and operate as though the contracts were in place. Neither party disputes this. This continued course of dealing reflects a willingness to be bound by the contract. *See Kransz v. Uedelhofen*, 193 Ill. 477, 489, 62 N.E. 239, 244 (1901)(finding that acts of acquiescence, adoption, and recognition of the terms of the contract are sufficient to bind both parties to the agreement even if only one party signed the document).

The MSAs and SOWs included an explicit payment structure for the business relationship, which consisted of the contractor, APS, agreeing to haul-away products from Sears locations and pay Sears a per-appliance fee for what was taken. As part of the agreement, APS was free to sell the used appliances or the scrap parts at a profit. The remainder of the unusable materials were to be recycled and disposed of in accordance with the expectations of the contract. There was no guarantee about the amount of usable versus unusable appliances in the agreement. Further, the contract expressly proscribed that all expenses related to the haul-away services, including recycling or disposal services, were to be absorbed by APS with no cost to Sears. APS was to bear the

9

financial burden for any capital, expenditures, salaries, etc… acquired to effectuate the haul-away services. APS agreed to these terms twice, by signing the 2011 and 2014 agreements. APS also adhered to the terms in practice for the majority of their relationship with Sears, making it clear that APS intended to include the collateral benefit along with the contracted haul-away services. APS cannot now attempt to recoup for the added value it agreed to provide at its own expense to Sears under the contract. APS' present dissatisfaction with the profitability of this venture is not a basis for unjust enrichment, especially where an existing contract explicitly dictates that these expenses were to be accepted by APS. It is not appropriate to apply this equitable relief theory under these circumstances. As a matter of law, APS' claim of *quantum meruit* fails and Sears' motion for summary judgment as to Count I is granted.

*Counts II and II – Fraudulent Misrepresentations*

Sears moves for summary judgment on Counts II and III because APS did not prove that Sears made any material false statements or misrepresentations in its 2011 and 2014 Bid Proposals, respectively, that caused APS to suffer actual damages. In the aforementioned counts, APS alleges that Sears' induced APS to increase its bid prices by fraudulently labeling the Bid Proposals "Monthly Volume Totals by Unit," but only including figures from a single month that differed substantially from the actual historical volumes. Additionally, APS alleged in Count III that the 2014 Bid Proposal included outlet locations for which it lacked the authority to award contracts in order to increase APS' bid prices.

A successful claim of fraud against Sears requires clear and convincing evidence that Sears: (1) made a false statement that they knew to be false; (2) with the intent to induce APS to act; (3) that APS justifiably relied on that information to their detriment; and (4) that damages resulted from that reliance. *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 852 (7th Cir. 2007). The misrepresentation must be of a material fact. This means that "the party claiming fraud would have

10

acted differently had it been aware of [the fact] or if [the fact] concerned the type of information upon which one would be expected to rely when making the decision to act." *BP Amoco v. Flint Hills Res.*, No. 05 C 5661, 2009 U.S. Dist. LEXIS 131278, at *40 (N.D. Ill. Mar. 12, 2009)(St. Eve, J.). To be successful, APS must prove that Sears had intent to induce reliance on the false statements. This can be demonstrated "either where a party makes the representation knowing it is false or where the misrepresentation was made with a reckless disregard for its truth or falsity." *Id.* at *42-43. The burden is on the movant to demonstrate that there is no dispute of material fact. *Hotel 71 Mezz Lender Ltd. Liab. Co. v. Nat'l Ret. Fund.*, 778 F.3d 593, 601 (7th Cir. 2015).

Sears believes it is entitled to summary judgment because the numbers included in the 2011 and 2014 bid and pricing proposals were real figures and technically correct. The Court is not convinced. Merely citing the accuracy of the numbers does not defeat the question of whether that information was passed on to the vendors with the intent to induce reliance. The law is clear that even if a statement is technically true, omission of critical information or ambiguity may still render it a misrepresentation. *See Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997)("Opinions or ambiguous statements by the salesperson may be considered as factual representations if it would be reasonable for the other party to treat it as such."). The record does not provide any evidence that Sears intended the 2011 and 2014 bid and pricing proposals to be read as an exemplar that strictly applied to one month. *Compare BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 600 F. Supp. 2d 976, 981 (N.D. Ill. 2009)(St. Eve, J.)(finding that summary judgment is not appropriate for the interpretation of an ambiguity).

Here, although the volume numbers are technically true, APS presented sufficient evidence, from the vaguely labeled Bid Proposals to testimony and emails indicating Sears' desire to increase revenue, that there is a genuine issue of fact about Sears' intent to use the representations to induce

11

higher bidding prices. Accordingly, Sears' request for summary judgment is denied as to Counts II and III.

*Count IV – March 18, 2018 Meeting*

Both parties move for summary judgement as to Count IV. APS argues that this Court should rule in its favor because Sears made false statements of material fact to APS during the March 18, 2011 meeting that APS relied upon in deciding to increase the price of its bids and continue servicing Sears. Sears maintains that the allegedly fraudulent statements either did not occur or that the evidence could not sustain a fraud claim.

APS offered the testimony of both Basil Beck and Wendy Beck as evidence that the Sears' management team, mainly Fenske, made false statements about Sears' applianceanti-theft measures to control appliance losses and concealed the pervasiveness of haul-away theft in order to induce APS to bid at a premium price. Sears disputes these statements because the Fenske, and others on the Sears team, deny saying what Basil and Wendy Beck allege. APS also offered internal emails from Fenske as proof that Sears was aware of the appliance-theft issue, yet still made representations to assure APS that it was not a problem. Sears denies the validity and relevance of these emails, contending that they were mischaracterized, unsubstantiated opinions of Fenske alone and did not pertainto APS' specific situation. The substance of the meeting and Fenske's statements are the crux of Count IV's fraud claim. These statements are critical to determine whether Sears was aware of the theft problems and still made assurances that APS relied on to its detriment. Evaluating conflicting testimony requires this Court to weigh the credibility of the witnesses, which is not appropriate for summary judgment. *Payne v. Pauley, 337 F.3d 767, 771* (7th Cir. 2003)(finding it to be "dangerous territory" for a court to weigh conflicting evidence during summary judgment). Accordingly, as there is still a triable issue, both Motions for Summary Judgment are denied as to Count IV.

12

*Defendant's Counterclaim*

One of the defendants, Innovel, filed a counterclaim and maintains that it is entitled to summary judgment on it because APS breached their contract by refusing to pay for the thousands of used appliances it hauled away from the Sears facilities between December 2014 and April 2015.

To make out a claim for breach of contract in Illinois, MLIC must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)( citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)).

As an initial matter, this Court rejects any argument that no contract existed to govern the work performed after September 2014 because Sears did not sign the 2014 MSA and SOW, for the reasons discussed above, *see supra* at 8-10. Innovel maintains that it performed under the contract by supplying appliances to APS and so, it is owed the per-item fees. APS disputes that Innovel satisfied the condition precedent to payment—supplying the used appliances obtained through Sears' home delivery service as agreed upon, not from junk yards and thrift stores. Additionally, APS contends that Sears was adequately compensated during this time because it maintained possession of $1,125,000 of APS' money. These diverging positions create an issue of material fact about whether Innovel actually complied with the contract and whether APS' failure to pay was a justifiable breach. Thus, summary judgment is inappropriate here and Sears' motion is denied. *Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, No. 14 C 1512, 2017 U.S. Dist. LEXIS 42980, at *20 (N.D. Ill. Mar. 24, 2017)(Lee, J.).

**Conclusion**

Based on the foregoing, this Court grants Sears' Motion for Summary Judgment in part as to Count I, and denies it as to Counts II, III, IV, and the counterclaim. APS' Motion for Summary Judgment is denied.

IT IS SO ORDERED.

SHARON JOHNSON COLEMAN
United States District Court Judge

Dated: 5/22/2018